**William DONOVAN, Mark Vander May, Kevin Vander May, and Francis Vander May, Plaintiffs,**

v.

**UNITED STATES of America, acting Through FARMERS HOME ADMINISTRATION; Putnam Ranches, Inc.; Anne E. Putnam; and Maran, Inc., Defendants.**

**Civ. No. 91–5123.**

United States District Court, D. South Dakota, W.D.

Nov. 19, 1992.

Donald E. Covey, Covey Law Office, Winner, SD, for plaintiffs.

Robert A. Mandel, U.S. Attorney's Office, Rapid City, SD, for defendant Farmers Home Admin.

Wally Eklund, Johnson, Eklund & Abourezk, Gregory, SD, for Anne E. Putnam.

## MEMORANDUM OPINION

BATTEY, District Judge.

### PROCEDURAL HISTORY

At issue in this case is who has the right to payments owed by William Donovan, Francis Vander May, Kevin Vander May, and Mark Vander May (plaintiffs), under "Feeding Agreements" executed between plaintiffs and Anne E. Putnam. Plaintiffs admit that they owe the payments and there is no dispute as to how much those payments are.[1] However, both defendant Anne E. Putnam and the United States of America through the Farmers Home Administration (FmHA) have made demand upon plaintiffs for the payments. To avoid the possibility of multiple liability for the payments, plaintiffs brought this interpleader action so that the defendants would be forced to resolve their claims against each other.

### FACTS

On March 16, 1966, the property at issue in this case[2] was mortgaged by L.D. Putnam and Mary Wilma Putnam to the Prudential Insurance Company of America (Prudential) as security for a $230,000 debt. Prudential later transferred its interest to the First National Bank of O'Neill, Nebraska (First National Bank). On August 21, 1978, a second mortgage on the property was executed in favor of FmHA by Putnam Ranches, Inc.[3] as security for a $3,294,000 debt.

By July 1, 1988, L.D. and Mary Putnam were in default on their note to First National Bank. The bank initiated foreclosure proceedings in state circuit court for the Sixth Judicial Circuit in Bennett County, South Dakota.[4] FmHA was joined as a party defendant in this action and filed an answer. On May 22, 1989, the court granted First National Bank's motion for summary judgment. The judgment entered by the court thereafter extinguished the right, title, and interest of all defendants in the subject property except FmHA's redemption rights under 28 U.S.C. § 2410(c) and any other rights accorded defendants by the laws of South Dakota.

A foreclosure sale was held on July 6, 1989, at which time FmHA purchased the property for $88,212.34.[5] FmHA later paid

1. Plaintiff Donovan owes $20,850 plus interest and each Vander May owes $7,125 plus interest for a total of $21,375 plus interest for all three Vander Mays. Interest is computed at the rate of 15 percent commencing October 15, 1991 (contract due date), pursuant to South Dakota Codified Laws (SDCL) 54-3-5.

2. The property is located primarily in Bennett County, South Dakota, and also in part in Todd County, South Dakota. The legal description of the property can be found in the appendix to this opinion.

3. The mortgage was signed by William L. Putnam, as president of the corporation, and by Daniel Putnam, as secretary of the corporation.

4. The Honorable Donald L. Heck, Circuit Court Judge.

5. Although FmHa bid $488,000 for the property, it tendered a check to the Bennett County Sheriff for $586,880. This larger sum was to include payment for past-due real estate taxes owed to Bennett and Todd Counties on the property. The Sheriff refunded $98,822.48 to FmHa for the taxes, with the explanation that the taxes had to be paid directly to the County Treasurer's Office. The Sheriff also refunded $399,845.18 to FmHA. These funds represented the amount by which FmHA's bid exceeded the debt owed to First National Bank and the costs of sale. This refund of excess funds was apparently in violation of the state court's judgment in this case,

$60,732.49 to the Bennett County Treasurer for past due real estate taxes owing on the property.

On July 6, 1990, Putnam Ranches, Inc. transferred its right of redemption to Maran, Inc., and on that same day, Maran, Inc. redeemed the property from FmHA by paying $164,049.29, which covered FmHA's purchase price plus interest, the costs of the foreclosure sale, and the past due taxes paid by FmHA. On July 16, 1990, FmHA moved the state court to revoke the certificate of redemption issued to Maran, Inc. by the sheriff and to declare that FmHA was entitled to keep the surplus bid proceeds which it had retained since the foreclosure sale. The state court denied both motions in a memorandum opinion dated September 11, 1990, and a subsequent order dated October 15, 1990.[6]

Beginning on August 30, 1990, FmHA began sending letters to plaintiffs stating that FmHA was entitled to the payments they owed under the feeding agreements executed with Anne E. Putnam and that plaintiffs should send those payments directly to FmHA. Sometime after July 6, 1990, William Putnam, on Anne E. Putnam's behalf, also made demand on plaintiffs for the payments due under the feeding agreements. On March 29, 1991, Maran, Inc. transferred the property to Anne E. Putnam by quitclaim deed.

On October 3, 1991, plaintiff William Donovan initiated this interpleader action in state circuit court for the Sixth Judicial Circuit in Bennett County, South Dakota, naming Anne E. Putnam, Putnam Ranches, Inc., FmHA, and Maran, Inc. as defendants. On November 6, 1991, FmHA re-moved the action to this Court pursuant to 28 U.S.C. §§ 1444 and 1446. On January 29, 1992, this Court entered an order granting a stipulation to add Mark Vander May, Kevin Vander May, and Francis Vander May as additional party plaintiffs. The Vander Mays also owe money under similar feeding agreements executed with Anne E. Putnam, and have also received demand for payment from both FmHA and William Putnam.

On September 14, 1992, Anne E. Putnam filed a motion for summary judgment, asserting that she is entitled to plaintiffs' payments because the prior state court action extinguished FmHA's mortgage on the property in issue and any claims stemming from the prior action are barred by *res judicata* and *collateral estoppel*. On October 1, 1992, FmHA filed a cross-motion for summary judgment, asserting that it is entitled to plaintiffs' payments because Maran, Inc.'s redemption of the property revived its mortgage thereon and, under the assignments clause of the mortgage, the FmHA has a right to the payments. On October 2, 1992, plaintiffs filed a joint motion for summary judgment asserting that the disputes between the defendants do not concern plaintiffs and requesting that plaintiffs be allowed to deposit their payments with the Court and exit the lawsuit.[7]

There are four issues raised by these cross-motions for summary judgment:

1. Whether South Dakota state law or some uniform federal law should be applied to determine the rights of the parties.

which directed that all excess funds from the foreclosure sale were to be deposited with the court. In any event, the amount FmHa actually tendered to the sheriff after all refunds were made was $88,212.34.

6. Although the court denied FmHA's motion to keep the surplus bid proceeds, it appears that FmHA did not in fact have to turn over the proceeds it had kept. This is because the FmHA motion was styled a motion for disbursement of surplus bid proceeds. The court denied the motion on the grounds that no surplus bid proceeds had ever been deposited with the court, so the court had no proceeds to disburse. Thus,

the court's order did not require FmHA to refund the surplus proceeds it had kept in its possession all along.

7. Neither Putnam Ranches, Inc. nor Maran, Inc. have responded in any way to this lawsuit, although they were served with plaintiffs' complaints. Plaintiff Donovan originally moved for default judgment as to these two defendants, but then withdrew that motion on October 1, 1992. It would appear that neither corporation is asserting an interest in the payments owed by plaintiffs.

2. Whether the FmHA mortgage is valid under whatever law is applicable.

3. If the FmHA mortgage is still valid, whether the terms of that mortgage entitle FmHA to plaintiffs' payments under the feeding agreements.

4. If the FmHA mortgage is no longer of any effect, whether the claims of FmHA are barred by the doctrines of *res judicata* or *collateral estoppel.*

Because this Court finds that South Dakota law applies and that the FmHA mortgage is valid under South Dakota law, the Court need not address the fourth issue.

## DISCUSSION

### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 488 (1962). In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Recently, the Supreme Court noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

The trilogy of *Celotex, Anderson,* and *Matsushita* provide the Court with a methodology in analyzing defendants' motions. Under this trilogy, it is incumbent upon each defendant, based upon the showing set forth by the other defendant, to come forward with specific facts demonstrating that there is a genuine issue in order to counter the summary judgment motion. *Cf. Women's Health Center of W. County v. Webster,* 871 F.2d 1377, 1383 n. 9 (8th Cir.1989).

### B. Choice of Law

 As a preliminary matter, this Court must determine whether South Dakota state law or some uniform federal law will apply to this action. In any action in which the United States or one of its agencies is a creditor, federal law applies to determine the rights of the parties to the debt. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). However, Congress may decide, as a matter of federal law, that state law will apply to govern such relationships. That appears to be what Congress has done with respect to the rights of federal mortgagees upon foreclosure of the security real property:

(a) Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named as a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter—

\* \* \* \* \* \*

(2) to foreclose a mortgage or other lien upon

\* \* \* \* \* \*

real or personal property on which the United States has or claims a mortgage or other lien.

\* \* \* \* \* \*

(c) A judgment or decree in such action or suit shall have the same effect respecting the discharge of the property from the mortgage or other lien held by the United States **as may be provided with respect to such matters by the local law of the place where the court is situated**.... Where a sale of real estate is made to satisfy a lien prior to that of the United States, the United States shall have one year from the date of sale within which to redeem, ...

28 U.S.C. § 2410(a), (c) (emphasis supplied). Section 2410 specifically authorized the prior state court proceedings in this matter involving Putnam Ranches, Inc. and FmHA. Furthermore, section 2410 provides that the effect on FmHA's lien of that state court foreclosure action and subsequent redemption is to be determined by the "local law of the place where the court was situated," which is South Dakota. Therefore, the issue of whether there was a "discharge of the property from the mortgage" held by FmHA by reason of the prior state court proceedings is governed by South Dakota law.

C. Rights of Junior Mortgagee after redemption by the Debtor or Debtor's Successor in interest under South Dakota Law

Having determined that South Dakota state law applies to this action, this Court must now determine the content of that law. The judgment entered in the prior state court action involving Putnam Ranches, Inc. and FmHA stated the following:

7. That Defendants [including FmHA] and all persons claiming under them since the commencement of this action, shall be and hereby are forever barred and foreclosed of all right, title and interest and estate in or to said property or any part thereof from the time of sale except for the rights of redemption provided by the laws of the United States, specifically 28 U.S.C. § 2410(c) and the laws of the State of South Dakota.

Judgment of The Honorable Donald L. Heck, Circuit Court for the Sixth Judicial Circuit, *reprinted in* Defendant Anne E. Putnam's Statement of Undisputed Facts, Appendix 1, 72. Under the terms of this prior judgment, FmHA's security interest and mortgage in the property was extinguished by the foreclosure action unless provided otherwise by "the rights of redemption provided by the laws of the United States ... and the laws of the State of South Dakota."

■ South Dakota law provides for a minimum one-year period following a foreclosure sale of real property during which the debtor, or a successor in interest of the debtor, may redeem the property by paying the purchase price paid at the foreclosure sale, any deficiency owed on the debt foreclosed upon, interest, past due real estate taxes, and costs of sale. SDCL 21–52–5 [8], 21–52–11 [9], and 21–52–14.[10] When Maran,

---

8. **21–52–5. Persons entitled to redeem.** The owner, mortgagor, judgment debtor, or the successors of either, having any interest in the property sold and the holders of any lien, legal or equitable, subsequent and junior to that from which redemption is to be made, on the property sold, or any part thereof, or any share or interest therein, shall have the right to redeem from a sale ... in the manner hereinafter described. Such persons are denominated redemptioners.

9. **21–51–11. Minimum time allowed for redemption**.... All persons entitled to redeem shall in all cases have one year from the date of sale in which to redeem, ...

10. **21–52–14**.... Any redemptioner may redeem from the purchaser at any sale ... by paying to the sheriff or other person appointed by a court to make the sale, the amount of the purchase price, plus any sums paid by the purchaser to protect his interest in such property for taxes, insurance, installments of principal or interest upon a superior lien, with interest at the legal rate ... from date of sale upon the purchase price of the property, and from the date of the payment of any sum paid for taxes, insurance or installments of principal or interest on

Inc. redeemed the property in issue in this case on July 6, 1990, it was exercising the rights guaranteed under these sections of South Dakota Codified Law. South Dakota law further provides that:

> Where there has been full and final redemption by the owner, effect of the [foreclosure] sale is terminated, except in the case of redemption by cotenants.

SDCL 21–52–24. In this case, Maran, Inc.'s redemption was not a redemption by a cotenant. It was a redemption by a "successor in interest" under SDCL 21–52–7.[11] However, two issues arise in applying section 21–52–24 to the case at hand:

> Did the redemption by Maran, Inc. constitute a redemption by "an owner" as stated in section 21–52–24?

> If so, what is the status of the FmHA mortgage and security interest if "the effect of the [foreclosure] sale is terminated"?

1. Was Maran, Inc. "an owner" within the meaning of section 21–52–24?

No cases were found interpreting the word "owner" in section 21–52–24 of the South Dakota Codified Laws. A primary rule of statutory construction is that a statute should be construed so as to give effect to legislative intent. A number of lesser rules have developed to help ascertain legislative intent. One such rule is that if the drafters of a set of statutes used a particular term with a particular meaning in one place and omitted it in another place, that the statute where that term was omitted should not be given the same meaning as the statute where the term was inserted. 73 Am.Jur.2d *Statutes* § 235 (1974).

Looking at chapter 52, title 21 of South Dakota Codified Laws as a whole, there are at least two places where the word "owner" appears in the alternative with the terms "successor" or "successor in interest" or "grantee." SDCL 21–52–5 and 21–52–7. In contrast, the word "owner" appears alone in section 21–52–24. The rule discussed above would seem to indicate that the word "owner" as it appears in section 21–52–24 should not be interpreted as meaning "owner or successor in interest." Sections 21–52–5 and 21–52–7 certainly indicate that the drafters of chapter 52 knew how to convey the idea that a grantee or successor in interest could stand in the shoes of the owner. The fact that this was not explicitly done in section 21–52–24 would seem to indicate that the drafters did not intend to convey that idea in that section.

However, the primary rule of statutory construction is to give effect to legislative intent. There is some evidence that the drafters of chapter 52 sometimes used the word "owner" as a shorthand expression for "the owner, his successor in interest, or his grantee." Section 21–52–23 describes the time period for exercising the owner's final right of redemption. The term "owner" appears alone, without alternative terms such as "successor in interest" or "grantee." Yet section 21–52–23 obviously means to include persons such as the owner's successor in interest and the owner's grantee because this section allows the final right of redemption to be exercised "as prescribed in § 21–52–7." Section 21–52–7 states that a final right of redemption is reserved to the "owner, his grantee, or successor in interest."

As in section 21–52–23, the term "owner" in section 21–52–24 should also be interpreted to mean "owner, his successor in interest, or grantee." This interpretation would comport with the overall remedial

---

a prior lien. If the purchaser is the holder of a lien upon real property other than that under which sale was made, which is superior to the lien of the redemptioner, the redemptioner shall likewise pay the amount of the additional lien, including interest to the date of payment.

11. **21–52–7**.... The owner, his grantee, or successor in interest shall at all times have the final right to redeem after any and all redemptions as hereinafter provided shall have been made; and that right may be exercised by the owner, his grantee, or his successor in interest within fifteen days after the expiration of all other rights to redeem. The purpose of this section is to provide that the owner, any person to whom he has conveyed his title during the redemption period, and, in the event of his death, his successors in interest, shall possess a final right to redeem.

scheme of chapter 52 and avoid absurd results. If "owner" in section 21–52–24 were interpreted strictly to mean the judgment debtor in the foreclosure action, the following results would be possible. When an owner redeemed his own property from the purchaser at a foreclosure sale, the effect of the sale would be terminated. However, when an owner transferred his interest in the property to another party and that party redeemed the property, the effect of the sale would not be terminated. Thus, the application of 21–52–24 could easily be avoided. Finally, if a successor in interest can stand in the same shoes as the owner for purposes of availing himself of the benefit of exercising a final right of redemption, section 21–52–7, that same successor should also stand in the owner's shoes as to the effect of that redemption.

Therefore, this Court concludes that "owner" as used in section 21–52–24 means "the owner, his successor in interest, or his grantee." Thus, section 21–52–24 is applicable to Maran, Inc.'s redemption of the property in issue in this case.

2. What is the status of FmHA's mortgage if the effect of the foreclosure sale is terminated?

■ Having ascertained that section 21–52–24 applies to the redemption by Maran, Inc., what exactly does it mean to FmHA if the "effect of the sale is terminated"? There is a split of authority among state courts as to how to treat the *in rem* rights of a junior mortgagee when a senior mortgagee forecloses his lien, the property is sold at a foreclosure sale, and then the owner or his successor in interest redeems the property. *See generally* James T. Payne, Annotation, *Mortgages: Effect on Subordinate Lien of Redemption by Owner or Assignee from Sale Under Prior Lien,* 56 A.L.R. 4th 703 (1987). Some courts hold that the subordinate lien is revived, others that the junior mortgagee's *in rem* rights are extinguished but that his *in personam* rights against the debtor survive, and still other courts hold that the real property can only be sold once to satisfy all the liens against it if all the lienhold-

ers had the right to redeem the property. *Id.* § 2(a).

In a 1945 case, the South Dakota Supreme Court expressed the view that redemption revives the liens which were subordinate to the lien which was foreclosed upon. In *Rist v. Andersen,* 70 S.D. 579, 580, 19 N.W.2d 833, 834 (1945), a senior mortgagee had foreclosed upon two tracts of land on which plaintiff Rist held junior mortgages. The debtor made a partial redemption on one tract of land, which was sufficient to extend his redemption period on that tract by another two years pursuant to statute. *Id.* Then the debtor and the senior mortgagee entered into an agreement which extended the debtor's time to redeem on the second tract. *Id.*

Rist, the junior mortgagee, had a statutory right to redeem, but failed to do so within the time allotted by statute. *Id.* The issue before the court was not the effect of the debtor's redemption on Rist's mortgage, but rather whether the agreement between the debtor and the senior mortgagee extended the redemption deadline for Rist. The *Rist* court stated the following:

> A redemption by the mortgagor [debtor/owner] or his successor in interest terminates the effect of the sale and restores to him, free of the incumbrance of the [senior] mortgage foreclosed, his property, *and leaves the property subject to junior liens.*

*Id.* at 582, 19 N.W.2d at 835 (citations omitted) (emphasis added). The Court's responsibility is to divine what the Supreme Court of South Dakota would hold on this issue. This Court therefore holds that SDCL 21–52–24 and the *Rist* decision are authority for a holding that the redemption by Maran, Inc. revived the mortgage and security interest of FmHA in the property.

Having concluded that FmHA's mortgage was revived and is currently valid and enforceable, the next question becomes whether FmHA is entitled by virtue of that mortgage to the payments owed by plaintiffs under the "Feeding Agreements" between plaintiffs and Anne E. Putnam.

D. Do the payments under the "Feeding Agreements" between plaintiffs and Anne E. Putnam constitute "Rents, Issues and Profits" of the land or payments on account of a "Lease" of the Land?

The mortgage executed by Putnam Ranches, Inc. and FmHA contains the following language:

Borrower does hereby mortgage, assign, and warrant unto the Government the following property [description of property appears here] together with ... the rents, issues, and profits thereof ... and all payments at any time owning to Borrower by virtue of any ... lease....

Real Estate Mortgage For South Dakota, executed between Putnam Ranches, Inc. and FmHA, pages 1–2, *reprinted in* Defendant FmHA's Statement of Material Facts, Appendix, Exhibit 2.

The question is whether the payments due under the "Feeding Agreements" constitute rents, issues, profits, or lease payments within the meaning of the mortgage executed between these parties.[12] The feeding agreement does not specify from where Putnam obtained the food to feed plaintiffs' livestock. If the food all came from grazing the livestock on the vegetation growing on Putnam's land, then this would seem to support FmHA's position that it is entitled to the payments under the agreements. The feeding agreements would be tantamount to Putnam leasing her land to plaintiffs for the purpose of grazing their livestock. This would clearly be a payment owing to Putnam by reason of a lease of the land.

However, if Putnam fed the livestock even in part with food that did not come off of her land, the resolution of this issue is not so clear. If, for example, Putnam fed the plaintiffs' livestock with hay purchased from a third party, at least part and possibly all of the payments under the feeding agreements would not be connected in any way with the mortgaged property. Accordingly, they could not be characterized as rents, issues, profits, or lease payments of the land.

Plaintiffs Vander Mays have stated that they owe payments under the feeding agreements because they "pastured cattle" on Putnam's ranch. Stipulation to Joiner of Additional Parties Plaintiff, Vander Mays' Complaint for Interpleader, paragraph 7. Plaintiff Donovan only states that Putnam "fed" his cattle.

The factual conclusion which follows is that all Putnam did for her part of the feeding contract was to allow plaintiffs' livestock to graze from the vegetation growing on the property. Thus, the payments due under the feeding agreements with Anne E. Putnam are essentially lease agreements. Accordingly, the FmHA is entitled to these payments by virtue of its mortgage on the property.

### CONCLUSION

In sum, the FmHA mortgage would have been extinguished when the First National Bank of O'Neill foreclosed its mortgage and the property was subsequently sold at the foreclosure sale. FmHA protected its rights as a junior lienholder by purchasing the property at the foreclosure sale. When Maran, Inc., a successor in

---

12. The feeding agreements are terse and the one executed by Anne E. Putnam and William Donovan is reproduced in full below:

FEEDING AGREEMENT

THIS AGREEMENT entered into this _____ day of _____, 1991 by and between ANNE E. PUTNAM, hereinafter called PUTNAM and _____, called OWNER.

WITNESSETH, the parties agree as follows:

1. *FEEDING.* PUTNAM fed OWNER'S livestock from July 1, 1990 to on or about October 15, 1990 and shall feed the livestock from on or about May 1, 1991 through on or about October 15, 1991.

2. *PAYMENT FOR FEED.* As payment for said feed OWNER shall pay PUTNAM the sum of $_____ per head, One Half (½) payable at time of signing this Agreement and One Half (½) on or before October 15, 1991.

_____
Anne E. Putnam, Putnam

_____, Owner.
*See* Appendix to Plaintiff Donovan's Complaint, Exhibit C.

interest to the owner, redeemed the property, the FmHA mortgage was continued in full force and effect. It is the Court's conclusion that in South Dakota a redemption by a mortgagor (Putnam) or successor in interest (Maran, Inc.) from the foreclosure sale to a junior lienholder (FmHA) effectively terminates the foreclosure and restores the property to its preforeclosure status. This status included the FmHA mortgage. Such a rule is not only consistent with a reasonable interpretation of South Dakota statutes, but comports with the view that common sense would dictate that a redemption by the owner or successor in interest effectively annuls the sale, thus leaving the parties in the same position as they were prior to the foreclosure.

Under the terms of this mortgage, FmHA is entitled to any payments owing to Anne E. Putnam by reason of a lease of the property. The payments owing under the feeding agreements between plaintiffs and Putnam are such payments. Accordingly, this Court shall grant summary judgment in favor of FmHA, holding that FmHA is entitled to the payments plaintiffs owe under the feeding agreements. An order will issue forthwith.

## APPENDIX

The legal description of the property at issue in this case is as follows:

Lots 1 and 2, and East Half of Northwest Quarter, and Northeast Quarter, of Section 31; All of Section 32; Lots 6 and 7, and West Half of Southwest Quarter of Section 33; Lots 1 and 2, and East Half of Northwest Quarter, of Section 18; East Half of Section 19; East Half of Section 20; All of Sections 5, 29, and 30; Lots 5, 6, and 7, and Southeast Quarter of Northwest Quarter, and South Half of Northeast Quarter, and East Half of Southwest Quarter, and Southeast Quarter, of Section 6; All of Sections 7 and 8, all being in *Township 38, North, Range 33* in *Bennett County;* North Half of Section 12; Southeast Quarter of Section 15; North Half, and, Southeast Quarter, of Section 27; North Half of Section 35; North Half, and Southeast Quarter of Section 36; North

Half and Southeast Quarter of Section 22; All of Section 23, 24, 25, and 26, all being in *Township 38, North, Range 34,* in *Bennett County;*

South Half of Section 32, in *Township 39, North, Range 33;* in *Bennett County;*

West Half of Section 25, in *Township 39, North, Range 34,* in *Bennett County.* Lots 1, 2, 3, and 4, and, South Half of North Half, of Section 5. Lots 1, 2, 3, 4, and 5, and, South Half of Northeast Quarter, and, Southeast Quarter of Northwest Quarter of Section 6, all being in *Township 37, North, Range 33,* in *Bennett County.*

The Southwest Quarter of Section Nine, in *Township 36, North, Range 33,* in *Todd County.*

All West of the 6th Principal Meridian.